# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8648 | **DATE** | 12/4/2003 |
| **CASE TITLE** | Qualkenbush vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, Plaintiff's motion for summary judgment [24-1] is granted, Defendant's motion for summary judgment is denied [30-1], judgment is entered for Plaintiff, and the case is remanded to the Commissioner for further proceedings consistent with this opinion. Terminating case.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 35 |
| | Notified counsel by telephone. | DEC 05 2003 date docketed | |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 12/4/2003 | |
| | | U.S. DISTRICT COURT CLERK | date mailed notice |
| GR | courtroom deputy's initials | 03 DEC -4 PM 5: 21 | GR |
| | | Date/time received in Central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION



DOCKETED

DEC 0 5 2003

| | | |
|---|---|---|
| WALTER QUALKENBUSH, | ) | |
| Plaintiff, | ) | Cause No. 01 C 8648 |
| | ) | |
| v. | ) | Magistrate Judge Geraldine Soat Brown |
| | ) | |
| JO ANNE BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Walter Qualkenbush brought this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the decision of the Commissioner of Social Security denying in part his application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")[1]. Plaintiff first

applied for DIB and SSI in 1987. (Pl.'s Mot. at 2.) In May 1989, an Administrative Law Judge

("ALJ") concluded that Plaintiff was eligible for benefits beginning in June 1987. (R. 567.)[2] Plaintiff

was able to return to work in January 1989. (R. 279.) Plaintiff claims that he became disabled again

on October 25, 1991. (R. 158, 162.) Plaintiff filed applications for DIB and SSI in December 1994.

(R. 158-164.) These applications have a protective filing date of August 31, 1993. (R. 12; Pl.'s Mot.

at 2.) That claim and Plaintiff's subsequent request for reconsideration were denied. (R. 165, 175.)

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not
significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000
WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000) (Ashman, M.J.).

[2] "R.___" refers to the certified record of proceedings, evidentiary documents, and
administrative hearing transcripts prepared by the Social Security Administration's Office of
Hearings and Appeals pursuant to 42 U.S.C. § 405(g).

A hearing before an ALJ took place on May 4, 1995 but was continued in order to allow Plaintiff to obtain counsel. (R. 83-94.) A second hearing was held on February 13, 1996. (R. 36-82.) The ALJ issued his decision on April 25, 1996, determining that Plaintiff had been disabled since March 30, 1994, but not before that date. (R. 12-18.) Plaintiff filed a request for review, which was denied more than three years later, on October 7, 1999. (R. 6.)[3] Plaintiff was granted an extension of time to file a civil action. (R. 4.) Plaintiff filed the present action on November 9, 2001. [Dkt 1.] The parties have filed cross-motions for summary judgment [dkt 24, 30], and have consented to the jurisdiction of a magistrate judge. [Dkt 13, 14.] Thus, the decision of this court constitutes the final ruling on the cross-motions. For the reasons stated below, Plaintiff's motion is granted, Defendant's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this decision.

## BACKGROUND

Plaintiff was 51 years old at the time of the 1996 hearing. (R. 39.) He has completed three and a half years of college. (R. 40.) Plaintiff worked at a resort in the Virgin Islands from 1980 to 1984. (R. 43.) Plaintiff next worked as a cement finisher until June 10, 1987. (*Id.*) Later, Plaintiff detailed cars for two months in 1989. (R. 42.) Plaintiff testified that his employer in that job agreed that Plaintiff could do limited work to the extent he was capable. (*Id.*) Plaintiff worked as a sales clerk for a month in 1990. (R. 41-42.) Between December 1990 and October 1991, Plaintiff worked for a cab company as a driver and a dispatcher. (R. 40-41.) Plaintiff testified that he has been unemployed since October 25, 1991, the date of his claimed onset of disability. (R. 40.) Plaintiff last

---

[3] Only the first page of the letter is present in the record.

looked for work in 1993. (*Id.*)

Plaintiff claims that he suffers from musculoskeletal problems, diabetes mellitus and major depression. (Pl.'s Mot. at 5.) The record contains an extensive medical history. Plaintiff testified that his initial injury took place in 1986 when a skid loader he was operating flipped over. (R. 105.) Plaintiff was injured again in 1987 while attempting to exit a basement through an escape window. (R. 103.) At Plaintiff's 1989 hearing, the ALJ noted that Plaintiff had undergone physical therapy, spinal surgery and knee surgery. (R. 563-564.) On October 25, 1991, the date of his current alleged onset, Plaintiff was again injured while driving over railway tracks and was seen at Edward Hospital Emergency Room. (R. 419.)

The record includes medical records from Plaintiff's treating physician, Dr. George Markarian, beginning with Plaintiff's 1987 injury through January 1993. (R. 357-67.) On November 13, 1992, Dr. Markarian diagnosed Plaintiff with "early stage three compartment arthritis of the knee joint." (R. 357.)

The record reflects numerous medical images of Plaintiff. A bone scan[4] of Plaintiff's entire body and a tomogram[5] of Plaintiff's lumbar spine were taken on June 17, 1987. (R. 460.) There is a reference to x-rays of Plaintiff's knee in 1987. (R. 367.) An MRI[6] of Plaintiff's right knee was

---

[4] A bone scan consists of "images made on photographic film by gamma rays emitted from a radionuclide previously injected into the bloodstream." *Attorneys' Textbook of Medicine* ¶ 6A.23(2g) (Roscoe N. Gray and Louise J. Grady eds., 3d ed., Matthew Bender, 2003).

[5] A tomogram is "[a]n x-ray picture taken by a special method which brings out the details at a particular depth of a tissue or an organ, while blurring the details at other depths or planes." J. E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 6, T-152 (Matthew Bender, December 2002).

[6] MRI stands for magnetic resonance imaging. *Id.* at Vol. 4, M-279. An MRI is "[a] complex electronic procedure for producing images of internal structures of the body . . . based

taken on October 12, 1988 (R. 448), and an MRI of Plaintiff's left knee was taken on February 7, 1989. (R. 444.) An arthrogram[7] of Plaintiff's left shoulder was taken on December 18, 1989 (R. 439), and an MRI of Plaintiff's left shoulder was taken on December 26, 1989. (R. 437.) Additional x-rays of Plaintiff's cervical and lumbar spine appear to have been taken on October 25, 1991. (R. 417-418.) X-rays of Plaintiff's lumbar and cervical spine, shoulders and knees were taken on October 27, 1993. (R. 370-373). An MRI of Plaintiff's lumbar spine was taken on May 23, 1994. (R. 490-491.) An ultrasound examination[8] of Plaintiff's kidneys was performed on June 21, 1994. (R. 488.) A myelogram[9] of Plaintiff's lumbar and cervical spine was taken on August 5, 1994, which reflected "first degree spondylolisthesis"[10] and "severe stenosis."[11] (R. 497.)

On October 27, 1993, Dr. Walter Shemerdiak completed a compensation and pension examination of Plaintiff. (R. 368-369.) Dr. Shemerdiak diagnosed Plaintiff with degenerative joint

_____

on the assessment of the density of hydrogen protons in the cell nuclei of the body." *Id.* at M-15.

[7] Arthoscopy is the "visual examination of a joint through a fiberoptic endoscope inserted though a skin incision." *Attorneys' Textbook of Medicine* at ¶ 6A.23(2c).

[8] Ultrasound is "energy consisting of sound-like vibrations or waves of high frequency... utilized... like radar, to detect regions of altered density within the body." Schmidt, *Attorneys' Dictionary of Medicine* at Vol. 6, U-13.

[9] A myelogram is an x-ray of the spinal cord made after the injection of a contrast substance. *Id.* at Vol. 4, M-327.

[10] Spondylolisthesis is the forward displacement of a vertebra. *Id.* at Vol. 5, S-262.

[11] Stenosis is the abnormal narrowing of a body passage, opening, canal or duct. *Id.* at S-290.

4

disease ("DJD")[12] in both knees, residual cervical laminectomy infusion[13] and diabetes mellitus. (R. 369.) He further noted that "minimal crepitation and pain was noted on flexion of knees, bilaterally. The [Plaintiff] could squat without significant difficulty, gait was essentially normal." (*Id.*)

A consultative examination of Plaintiff was performed on November 1, 1993, by Dr. C. J. Wonais for the Bureau of Disability Determination Services ("DDS"). (R. 377-379.) Dr. Wonais specializes in internal medicine. (R. 478.) Dr. Wonais reported Plaintiff's medical history and Plaintiff's complaints of pain in his spine and knees, limiting Plaintiff's ability to walk and lift objects. (R. 377.) Dr. Wonais observed that Plaintiff walked with a slight limp but did not need an ambulatory aid. (*Id.*) Dr. Wonais observed some limitations on Plaintiff's range of motion and some numbness in Plaintiff's upper extremities. ( R. 378.) Dr. Wonais' impression was that the pain in Plaintiff's knees limited his ability to bend and walk distances. (*Id.*) X-rays taken in 1991 revealed Grade I spondylolisthesis in the lumbar spine, as well as anterior fusion in the cervical area. (*Id.*)

Dr. Wonais also concluded that Plaintiff was "well oriented" but a "terrible historian... going off into different tangents." (R. 378.) Plaintiff was "oriented to person, place and time," and appeared normal, but Plaintiff's behavior was "somewhat unusual" in that it was difficult to get him to answer a question directly. (*Id.*)

Two Residual Functional Capacity ("RFC") Assessments of Plaintiff were completed by non-examining consultants. The first assessment was completed on November 12, 1993 by Dr. Robert England. (R. 380-387.) The second assessment was completed on May 27, 1994 by an unknown

---

[12] DJD is osteoarthritis, a "form of arthritis or joint disease characterized by bone remodeling . . . overgrowth of bone and degeneration of cartilage." *Id.* at Vol. 4, O-114.

[13] Laminectomy is the surgical removal of a portion of a vertebra. *Id.* at Vol. 3, L-25.

doctor.[14] (R. 468-475.) Both doctors stated that Plaintiff was limited to occasional crouching (R. 382, 470), but concluded that he could sit, stand and walk for about six hours in an eight hour day. (R. 381, 469.) Dr. England found Plaintiff to be limited to lifting fifty pounds occasionally and twenty-five pounds frequently. (R. 381.) The unknown doctor found Plaintiff limited to lifting twenty pounds occasionally and ten pounds frequently. (R. 469.)

A psychiatric evaluation was performed on February 26, 1994 by Dr. Farid Karimi for DDS. (R. 389-392.) In the "Diagnostic Impression" section of his report, Dr. Karimi noted: "Axis I: Rule out Dysthymic Disorder; Axis II: Deferred; Axis III: History of Diabetes since 1989, Pain in both knees, Chronic Cervical Strain and pain in mid back." (R. 392.) It is unclear whether Dr. Karimi ruled out dysthymic disorder or was stating that it had yet to be ruled out. Dr. Karimi also concluded that "[i]t appears that there has been no significant deterioration in [Plaintiff's] personal, social and occupational functioning (due to any psychiatric problem) in the past two years." (*Id.*)

Dr. John Tirado conducted a psychological examination of Plaintiff on March 30, 1994. (R. 405- 410.) Dr. Tirado observed that Plaintiff was "not able to sustain a continuous effort without heightened sensitivity in his back and knees." (R. 409.) He concluded that the "combined effect of [Plaintiff's] current emotional state and his physical condition seriously limit [Plaintiff's] adaptive functioning." (*Id.*) Dr. Tirado also completed a Psychiatric Review Technique Form ("PRTF") and a Mental Residual Functional Capacity ("MRFC") Evaluation Form on April 8, 1994. (R. 393-404.) In the MRFC form, Dr. Tirado stated that Plaintiff was diagnosed with the following DSM-III Classifications: 311.00 Depressive Disorder NOS [not otherwise specified]; and 301.00 Paranoid

---

[14] The signature is illegible and is noted as "illegible" in the index to the administrative record. (R. 2.)

Personality Disorder. (R. 396.) He observed that Plaintiff suffered from "marked" limitations in eight of twelve areas and that his limitations began seven years earlier. (R. 394-396.) According to the MRFC form, a marked impairment is one which "seriously affects ability to function." (R. 393.) In his PRTF, Dr. Tirado concluded that Plaintiff met Listing 12.04 of 20 C.F.R. Pt. 404, Subpt. P, App. 1, which addresses affective disorders. (R. 397.) He also concluded that Plaintiff had marked difficulty in maintaining social functioning and frequent deficiencies of concentration, persistence, or pace. (R. 403.)

Another PRTF was completed on April 28, 1994 by Dr. D.G. Hudspeth. (R. 336-344.) Dr. Hudspeth also completed a MRFC Assessment on May 18, 1994. (R. 464-467.) Dr. Hudspeth concluded that Plaintiff was moderately limited in a few areas but that "[h]e could perform simple and routine tasks in the work setting and could relate to a supervisor and fellow employees." (*Id.*)

## THE ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 416.920 (2003). Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity, despite his impairment, to perform his past relevant work; and (5) if the

7

claimant cannot perform his past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering his residual functional capacity together with his age, education, and work experience. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Young*, 957 F.2d at 389.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (R. 12.) At step two, the ALJ found that Plaintiff suffers from severe impairments. (R. 13.) At step three, the ALJ concluded that Plaintiff's impairments do not meet or equal a listed impairment. (*Id.*) At step four, the ALJ concluded that, based on his RFC, Plaintiff could perform "a full range of unskilled light work" prior to March 30, 1994. (*Id.*) The ALJ also stated that Plaintiff had the RFC "to perform the physical exertion requirements of work except for lifting and carrying over 20 pounds." (R. 17.) The ALJ concluded that, prior to March 30, 1994, Plaintiff could perform his past work as a taxi cab driver and dispatcher. (*Id.*) The ALJ concluded that, after this date, Plaintiff's condition worsened to the point that the combination of his impairments were sufficient to render him disabled. (R. 15.)

The ALJ concluded that there were "very minimal physical findings" to support Plaintiff's allegation of musculoskeletal disability. (R. 13.) The ALJ further found that there was no evidence of a mental impairment prior to March 30, 1994. (R. 14.) Finally, the ALJ noted that, beginning in 1994, medical records "confirm a general decline" in Plaintiff's physical condition. (R. 15.) The ALJ stated that Dr. Tirado's examination provided the first evidence of a mental impairment. (R. 14.) The ALJ stated that "[a]s of the date of Dr. Tirado's examination, the record is found to reasonably

8

support a worsening of [Plaintiff's] condition such that the combined effect of his emotional state and physical condition seriously limited his adaptive functioning." (*Id.*) No medical expert or vocational expert testified at Plaintiff's hearing. (R. 37.)

## LEGAL STANDARD

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) ("[t]he ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible"). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 416.927(d)(2)).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, this does not mean that the ALJ is entitled to unlimited judicial deference. Regardless of whether there is adequate evidence in the record to support the ALJ's decision, the ALJ must build an accurate and logical bridge from the evidence to his or her conclusions, because the court confines its review to the reasons supplied by the ALJ. *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the ALJ's decision, the decision cannot be upheld. *Id.* The ALJ must state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young*, 957 F.2d at 393 (ALJ must articulate his reason for rejecting evidence "within reasonable

limits" in order to allow for meaningful appellate review). An ALJ's opinion cannot contain conflicting factual determinations. *Smith v. Massanari*, No. 00-C-7504, 2001 WL 936123 at *1 (N.D. Ill. Aug. 16, 2001) (Shadur, J.).

## DISCUSSION

Plaintiff argues that the ALJ made several errors in his determination that Plaintiff was not disabled prior to March 30, 1994. Specifically, Plaintiff argues that the ALJ: (1) failed to conduct a proper step three analysis; (2) ignored evidence favorable to Plaintiff regarding the period prior to March 30, 1994, and, consequently, erred in his determination of Plaintiff's onset date; and (3) erred in his determination of Plaintiff's credibility.

### *1. The Step Three Analysis*

In his post-hearing memorandum to the ALJ, Plaintiff argued that the evidence demonstrated that he met or equaled several of the listings in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 590-95.) Specifically, Plaintiff argued that he met Listing 1.05(C) (Other Vertebrogenic Disorders); Listing 1.03 (Arthritis of Major Weight Bearing Joint); and Listing 12.04 (Affective Disorders). (*Id.*) The ALJ's opinion at step three did not address any particular listing but issued a general finding that:

> [Plaintiff's] impairments, although severe, do not meet or equal the requirements of any medical listing in Appendix 1. All of the objective and neurological criteria required of any section in category 1.01 for musculoskeletal impairments are not present in the record. In fact there are very minimal physical findings. [Plaintiff's] mental impairments do not manifest the degree of functional limitations required of the paragraph B criteria.

(R. 13.)

It is difficult to see how the ALJ concluded that there were "very minimal physical findings," particularly in light of the fact that in 1989 the Commissioner had determined that Plaintiff had physical impairments that "equaled" Listing 1.05(C) (R. 565), and the fact that in 1993 Plaintiff's treating physician, Dr. Markarian, diagnosed "early stage three compartment arthritis of the knee joint." (R. 357.) Plaintiff's post-hearing memorandum outlined specific evidence that Plaintiff believed supported a finding with respect to each of the listings. (R. 590-95.)

One of the consulting doctors, Dr. Tirado, concluded that Plaintiff met Listing 12.04. (R. 397.) The ALJ was not required to accept Dr. Tirado's conclusion. He was, however, required to evaluate it properly, along with any other medical opinions, and identify his reasons for rejecting it. In this case, the ALJ did not explain his reasons for rejecting Dr. Tirado's conclusion that Plaintiff met Listing 12.04.

"[F]ailure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand." *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 936 (7th Cir. 2002)). In *Brindisi*, the Court of Appeals reversed the District Court's judgment in favor of the Commissioner where the ALJ's failure to discuss the plaintiff's impairments in light of the listings "frustrate[d] any attempt at judicial review." 315 F.3d at 786. *Accord Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (holding that "[b]y failing to discuss the evidence in light of [the listing's] analytical framework, the ALJ has left this court with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (remanding because "[a]lthough Steele's medical records plainly documented his history of seizures, the ALJ altogether failed to discuss, or even cite, listing 11.03.").

12

Although the ALJ found Plaintiff to be disabled at step five as of March 30, 1994, remand is still necessary for a correct step three analysis. If a thorough analysis at step three were to result in the conclusion that Plaintiff's impairments meet the requirements of a listing, the ALJ would be required to determine the date of the onset of disability in light of that conclusion, which might be earlier than March 30, 1994. Thus, this case must be remanded for an appropriate analysis at step three.

2. *Determination of the RFC and the Onset Date*

As discussed above, Dr. Tirado examined Plaintiff on March 30, 1994 and concluded that Plaintiff's impairment met the requirements of Listing 12.04 (R. 397). Dr. Tirado also stated that Plaintiff's limitations began "seven years" previously. (R. 396.) However, the ALJ rejected Dr. Tirado's conclusion of a listing-level impairment and moved ultimately to step five, where the ALJ found that "since March 30, 1994, the range of light work that [Plaintiff] could be expected to perform [was] significantly compromised by his mental state" and, as a result, Plaintiff was disabled "as of the date of Dr. Tirado's examination." (R. 15.) Significantly, the ALJ concluded that, prior to March 30, 1994, "there was no evidence of a mental impairment" and Plaintiff could perform "a full range of light work." (R. 14, 16.) The ALJ did not mention or discuss Dr. Tirado's statement that Plaintiff's mental impairment began "seven years" previously.

The ALJ's decision rests on two prongs, both of which are contested by Plaintiff. First, the ALJ found that Plaintiff was capable of the full range of light work; and second, the ALJ concluded that the mental impairment that limited Plaintiff's ability to perform at that level began on March 30, 1994.

13

In assessing Plaintiff's RFC, the ALJ must comply with Social Security Ruling 96-8p ("SSR 96-8p"). *See Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991) (Social Security rulings are binding on all components of the Social Security Administration, including the ALJs). In an RFC assessment, the ALJ must perform a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activity." SSR 96-8p, 1996 WL 374184 at *3. The ALJ must consider the individual's ability to perform "each of seven strength demands: [s]itting, standing, walking, lifting, carrying, pushing and pulling." *Id.* at *5. Each function "must be considered separately (e.g. 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours')." *Id.* "It is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work." *Id.* SSR 96-8p states that "it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." *Id.* at *3. SSR 96-8p further requires that:

> [t]he RFC assessment . . . include *a narrative discussion describing how the evidence supports each conclusion,* citing specific material facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) [footnote omitted], and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.*

*Id.* at * 7 (emphasis added).

The ALJ found that, prior to March 30, 1994, Plaintiff was able to "perform a full range of unskilled light work." (R. 13.) The ALJ stated that Plaintiff's impairments "precluded heavy lifting

14

and carrying, as well as extensive climbing, crawling, or stooping. These are not features, however, of light work." (R. 14.)   However, Plaintiff points to Social Security Ruling 83-14 ("SSR 83-14"), which states:

> The major difference between sedentary and light work is that most light jobs--
> particularly those at the unskilled level of complexity--require a person to be
> *standing or walking most of the workday.* Another important difference is that the
> frequent lifting or carrying of objects weighing up to 10 pounds (which is required
> for the full range of light work) *implies that the worker is able to do occasional
> bending of the stooping type: i.e., for no more than one-third of the workday* to bend
> the body downward and forward by bending the spine at the waist.

1983 WL 31254 at *4 (emphasis added).

The ALJ's analysis of Plaintiff's RFC does not comply with the requirements of SSR 96-8p. There is neither a function-by-function assessment, nor an analysis of how the evidence supports the assessment. As one example, the ALJ did not explain how Plaintiff who cannot perform "extensive stooping" could perform light work requiring stooping for up to one-third of the workday. Likewise, the ALJ did not describe how Plaintiff, with arthritis in both knees, could stand or walk most of the workday. Because the ALJ has "failed to articulate a reasoned basis for his ruling, . . . the ruling cannot stand." *Henderson v. Barnhart*, No. 03-1828, 2003 WL 22659653 at *2 (7th Cir. Nov. 12, 2003).

Plaintiff also disputes the second prong of the decision, the ALJ's finding that Plaintiff was not disabled until March 30, 1994. That date has no significance in the record other than as the date of Dr. Tirado's examination. Plaintiff argues that, rather than determining Plaintiff's onset date by considering the policy expressed in Social Security Ruling 83-20 ("SSR 83-20"), the ALJ simply and improperly adopted the date of Dr. Tirado's reports as the date of onset. (Pl.'s Mot. at 21-22.)

SSR 83-20 sets out the framework within which an ALJ is required to evaluate the onset date

of a disability. In the case of "slowly progressing impairments, an onset date must often be inferred, especially when adequate medical records are not available." *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). For disabilities of nontraumatic origin, SSR 83-20 requires that the ALJ consider "the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity" in determining an onset date. 1983 WL 31249 at *2. The onset date "can never be inconsistent with the medical evidence of record." *Id.* at *3. However, "[i]n some cases, it may be possible, based on the medical evidence, to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination . . . ." *Id.* When "there is no medical evidence as to the precise onset date, but where the disabling impairment seems to have occurred prior to the date of the first recorded medical examination, the ALJ 'should call on the services of a medical advisor' to help in making the necessary inferences." *Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir. 1987) (quoting SSR 83-20). When it is necessary to infer an onset date, "[c]ourts have consistently interpreted the relevant language to require the ALJ... to consult with a medical advisor..." *Williams v. Chater*, No. 96 C 1833, 1996 WL 473466 at *6 (N.D. Ill. Aug. 16, 1996) (Conlon, J.). The ALJ did not call a medical advisor to testify at Plaintiff's hearing.

The ALJ's opinion states that Dr. Tirado's March 30, 1994 report is the first evidence of Plaintiff's mental impairment. (R. 14.) That is not quite accurate, as discussed below. In addition, Dr. Tirado expressly stated that Plaintiff's impairment had existed for "seven years." (R. 396.) The ALJ did not discuss that evidence. The ALJ's opinion cites Dr. Karimi's report of his examination of Plaintiff on February 26, 1994 as evidence that Plaintiff was then engaging in a wide range of activities (R. 15), but does not discuss how that finding supports an ability to maintain the

16

concentration necessary for employment. Furthermore, Dr. Karimi also observed that "for most of the interview [Plaintiff] was extremely tangential and he had to be redirected." (R. 391). The ALJ did not discuss Dr. Karimi's ambiguous notation: "Rule out Dysthemic Disorder." (R. 392.) Dr. Karimi concluded that Plaintiff's functioning had not significantly *deteriorated* in the previous two years (*id.*), but that conclusion leaves unanswered whether Plaintiff's mental state prevented meaningful employment. The ALJ's opinion stated: "Dr. Wonais' noted that [Plaintiff's] mental status evaluation was essentially normal." (R. 14.) Putting aside the fact that Dr. Wonais, an internist, was not attempting a psychological evaluation, the ALJ's statement is not precisely what Dr. Wonais concluded in 1993. Dr. Wonais stated that Plaintiff's *appearance* was normal and that he was well oriented, but he also found that Plaintiff kept going off into different tangents and that his behavior was "somewhat unusual." (R. 378.) That is certainly contrary to the ALJ's finding that there was no evidence of mental impairment prior to March 30, 1994.

In *Henderson*, the court found that, although an ALJ "generally should" consult a medical advisor when the onset day must be inferred, it was not error for the ALJ to fail to do so in that case because the medical records were complete. *Henderson*, 179 F.3d at 513. In this case, the ALJ clearly should have obtained the testimony of a medical expert. Although Plaintiff had a substantial medical record, the evidence regarding his psychological state between 1991 and 1994 is limited. The ALJ premised his decision on the interaction of medical and psychological conditions, yet no medical expert specifically addressed that point. The only discussion of those factors is in Dr. Tirado's report, which concluded that Plaintiff had a listing level impairment and suggested seven years as the duration of that impairment. This case must be remanded for a proper determination of the onset of Plaintiff's disability, including obtaining testimony from a medical advisor.

17

## 3.    *Credibility Determination*

The ALJ concluded that Plaintiff's testimony as to his pain and physical limitations was not credible, stating that it was not consistent with his complaints at the hearing and elsewhere in the record. (R. 16.) Credibility determinations must comply with Social Security Ruling 96-7p ("SSR 96-7p"), which requires that the ALJ consider, in addition to the objective medical evidence, the following:

1.    The individual's daily activities;
2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.    Factors that precipitate and aggravate the symptoms;
4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

1996 WL 374186 at *3.

The ALJ discounted Plaintiff's credibility because Plaintiff's "physical complaints are . . . out of proportion with his daily activities."(R. 16.)  However, the ALJ failed to identify what activities Plaintiff performs and why those activities are inconsistent with his complaints. *See Clifford*, 227 F.3d at 872 (holding that the ALJ's listing of "minimal daily activities" did not support discounting claimant's testimony regarding pain.)

The ALJ's opinion further states in support of the credibility finding that "the claimant has not pursued treatment and has refused to use medications." (R. 16.) SSR 96-7p requires that the ALJ consider reasons why the claimant failed to pursue medical treatment, including concerns over side

effects or the ineffectiveness of treatment. 1996 WL 374186 at **7-8. In addition, the Seventh Circuit has cautioned against drawing negative inferences from the fact that an individual is not being treated with heavy painkillers. *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

At the hearing, Plaintiff testified that he refused to take over-the-counter medications such as Aspirin or Tylenol. (R. 48.) He further stated that he stopped taking one prescription medication because it did not help his conditions and he feared that it would damage his liver. (R. 48-49.) Plaintiff did not state whether it was his doctor's or his own conclusion that the medication was not helpful and potentially harmful, or whether he stopped taking medication at his doctor's direction or on his own. Plaintiff further testified that he currently had a card from Public Aid. (R. 50.) He stated that he would not return to University of Illinois Hospital for non-emergency care due to poor treatment he had received there in the past. (R. 49-50; 46-47.) From this testimony, the ALJ concluded: "The claimant . . . testified that he can get medical treatment from Public Aid but is afraid to go. This testimony is consistent with his paranoia which also explains his reluctance to take medications and comply with treatment recommendations." (R. 16.)

There is an inherent inconsistency between the ALJ's findings, first, that Plaintiff refused to use medication due to his psychological impairment (paranoia), and second, that Plaintiff's refusal to use medication renders his testimony regarding his pain and limitations not credible. *See Clifford*, 227 F.3d at 872 ("the [ALJ] must build an accurate and logical bridge from the evidence to his conclusion"). Thus, the case must be remanded for a proper evaluation of Plaintiff's credibility.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, Defendant's

motion for summary judgment is denied, judgment is entered for Plaintiff, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

December 4, 2003